PER CURIAM.
¶1 Steven Luckett appeals a judgment of conviction for attempted first-degree intentional homicide by use of a dangerous weapon and for second-degree recklessly endangering safety by use of a dangerous weapon, as well as an order denying his motions for postconviction relief and postconviction discovery. Luckett argues on appeal that: (1) he was denied due process because police failed to preserve a bed comforter as evidence; (2) he is entitled to an order for postconviction discovery permitting him access to the trial evidence and to conduct trace evidence testing of a bullet fragment recovered from his body; (3) anticipated testimony from an expert criminologist constitutes newly discovered evidence; and (4) his trial counsel was ineffective for not procuring the testimony of a firearms expert. We conclude Luckett is not entitled to relief, and, consequently, we affirm.
BACKGROUND
¶2 Luckett was charged in an Information with two counts of attempted first-degree intentional homicide by use of a dangerous weapon. At trial, Janice[1] testified that she had dated Luckett for approximately thirteen years before she broke off their relationship in June 2012. On the evening of July 5, 2012, Janice was cooking inside her home when she saw Luckett in her garage removing his truck, which he had parked at her residence. Luckett called Janice and asked her to move her car from the driveway so that he could leave. Janice sent a friend, Tasha, to move the car, but Luckett did not leave. Luckett again called Janice, and they argued about their relationship. Janice eventually asked him over the phone to leave the property, after which she hung up.
¶3 Janice testified that after she hung up on Luckett, she went to her bedroom where her boyfriend, Peter, was watching television. As they were getting ready to watch a movie, Janice heard a noise, opened her bedroom door, and saw Luckett coming down the hallway toward her bedroom. Janice testified she slammed the bedroom door, but Luckett forced it open and "pulled out a gun and started shooting." Janice could not recall how many shots Luckett fired. The next thing she could recall was Luckett and Peter wrestling for the gun on the bed. Janice joined in the fray to try to wrest the gun away from Luckett. Janice could not recall if any additional shots were fired as the trio wrestled for the gun.
¶4 Janice testified Luckett then ran out of the room. Janice saw blood, and Peter told her he was shot. A short time later, Luckett broke down the bedroom door and stabbed Janice in the neck and stomach with a knife. The three entered the hallway in a struggle, and Janice recalled that Peter was hitting Luckett with a gun.[2] Janice testified she fled to the bedroom, and Luckett returned shortly with a bigger knife from her kitchen. Luckett did not attack Janice again, but rather he sat on the edge of the bed over Janice as she pleaded for her life. Janice was eventually able to convince Luckett to leave after she told Luckett the police were on the way. Before leaving, Luckett told Janice that if she testified against him, he would kill her.
¶5 Peter testified consistent with Janice's account.[3] According to Peter, Luckett forced his way into Janice's bedroom and started shooting. Peter was shot in his arm, hip and leg. Peter attempted to grab the gun from Luckett, and the two struggled on the bed. Peter testified the gun fired several times during the struggle. Luckett eventually dropped the gun and fled from the bedroom. Peter took the gun and pulled the trigger, but it would not fire. Luckett came back into the bedroom and stabbed Janice twice, and the three then fought into the nearby hallway. Peter hit Luckett repeatedly with the gun, then attempted to flee the house. Luckett stabbed Peter in the stomach and pinned him against the door as he tried to leave. Eventually Peter was able to escape through the front door. Peter denied ever owning a gun, or possessing any gun on the night in question other than the one he had wrestled away from Luckett.
¶6 Police apprehended Luckett fleeing the area in his pickup truck. Luckett was bleeding, although officers could not tell from where as they attempted to administer medical aid. Luckett was admitted to the hospital and treated for the following injuries: two bullet wounds to his left wrist that resulted in two broken bones, a laceration to the rear of his head, and one wound to his left hip area that was diagnosed as soft tissue damage. An x-ray showed a bullet lodged in Luckett's left side, which was subsequently removed.
¶7 Luckett testified in his own defense at the trial. He acknowledged that he had a concealed carry permit and that he had carried a Glock handgun with him on the day of the incident. Luckett testified he was at Janice's house on July 5, 2012, to retrieve his personal effects from her residence. Luckett admitted he had entered the residence through a window and had seen Janice standing in a hallway, at which time she retreated to her bedroom and closed the door.
¶8 According to Luckett, when he entered the bedroom he saw Peter standing in the corner of the room. Luckett testified Peter grabbed a silver firearm from a nightstand and sat down on the bed. Peter then slid the gun under the bed comforter and fired two shots at Luckett, striking Luckett in his wrist and side. Luckett testified he pulled out his gun and returned fire. After Luckett's gun jammed, he ran towards the bed and started punching Peter in the face. Luckett stated that he lost his gun at some point, and he ran to the kitchen to grab a knife.
¶9 After retrieving the knife, Luckett testified he just "started stabbing." He believed he stabbed Peter first, followed by Janice as she attempted to intervene in the fight. Luckett let Janice have the first knife, but then he grabbed a second knife from the kitchen so he could have "some sense of security." Luckett testified he left in response to Janice's pleas to do so, and he tried to call the police from his truck but his wrist "was limp." According to Luckett, the gun with which he was shot was not the gun he brought to the scene.
¶10 Detective Edmund Fitting testified at trial that he arrived at Janice's residence after the scene had been secured. He recovered two knives and a firearm near the front door, which was identified as a Model 22 .40 caliber Glock handgun. Only Luckett's DNA was present on swabs taken from the handgun. The gun had a fifteen-round magazine that was loaded with eight Smith & Wesson .40 caliber brass bullets. Fitting testified he recovered four bullet casings from the bedroom, all of which were also Smith & Wesson .40 caliber brass casings. When asked to explain the three-bullet discrepancy, Fitting testified it was possible that the magazine was not fully loaded, or that he might have inadvertently overlooked some casings when he was analyzing the scene even though he believed he performed a thorough examination of the area.
¶11 Fitting also described his examination of several bullet holes found in the bedroom. Fitting testified there was one bullet hole in the corner of the bedroom opposite the bedroom door. Fitting identified two bullet holes in the comforter on the bed and three bullet holes in the mattress. Fitting did not know where the comforter was on the mattress when the shooting occurred, but he believed some of the bullets may have traveled through the comforter and also produced the bullet holes found in the mattress, with the comforter later shifting on the bed during the struggle for the gun. Fitting testified he could not identify the number of shots fired based on the number of bullet holes discovered in the bed articles. Police recovered two bullet fragments from underneath the bed.
¶12 Fitting also offered testimony relevant to the defense theory of there having been a second gun at the scene. He testified he did not know for certain how many guns were involved in the incident. However, he did not find any evidence indicating a second firearm had been used, and it was his opinion that only one firearm was involved. Fitting testified he was not looking for specific evidence supporting his one-gun theory, but rather for any evidence that was relevant to determining what may have occurred. He stated it would not be possible to identify with certainty, based only upon a person's wounds, how many shots were fired or how many times a person had been shot.
¶13 Mark Simonson, a firearms and tool mark examiner with the Wisconsin State Crime Laboratory, examined the Glock, the bullet casings, and the bullet fragments found at the scene. Simonson testified as to his opinion that all four bullet casings had been ejected from the Glock. Simonson also testified that the bullet fragments from under the bed had rifling markings consistent with the Glock barrel and were fired from that gun. Like Fitting, Simonson opined that all the evidence he reviewed was consistent with a single gun having been used. Simonson also analyzed a bullet fragment extracted from Luckett's body, but it was of insufficient quality to determine its caliber or the weapon from which it was fired.
¶14 The jury sent the circuit court a note after it had begun deliberations. Among other things, the jury asked whether there was "gunpowder residue on/under the comforter? Or blood?" By agreement of the parties, the court instructed the jury that it was to consider only the evidence received during the trial and the law as reflected by the jury instructions. The jury ultimately convicted Luckett of attempted first-degree intentional homicide by use of a dangerous weapon as to Peter, and of second-degree recklessly endangering safety by use of a dangerous weapon as to Janice. The court sentenced Luckett to a total of twenty-four years' initial confinement and thirteen years' extended supervision.
¶15 Luckett filed a motion for postconviction relief. He represented that he had retained a professional firearms expert, Gregory Martin, to review the evidence in his case.[4] Luckett argued Martin's opinion that one of the holes in the bed comforter appeared to have been made by a projectile being fired from underneath the comforter was newly discovered evidence entitling him to a new trial. Luckett also argued the State had violated his due process rights by failing to collect and preserve the comforter as evidence. Finally, Luckett contended his trial counsel provided constitutionally ineffective assistance by failing to hire a firearms expert to support his testimony regarding how the incident occurred. Luckett also filed a postconviction discovery motion seeking an order permitting Martin to inspect the casings and bullet fragments police had recovered, as well as to conduct a trace evidence test on the bullet fragment recovered from Luckett's body.
¶16 The circuit court denied the motions without a hearing, explicitly adopting the reasoning found in the State's response brief.[5] The State opposed Luckett's due process argument on the basis that the bed comforter was in no manner exculpatory. The State argued that Fitting had closely examined the bedding materials after the incident and stated there were "no powder burns or anything resembling a burn[ ] that would indicate that any of these items came into contact with a discharged firearm." Additionally, the State argued there could be no due process violation because the first time Luckett claimed a gun had been fired from under the bed comforter was at trial, the officers had not been apprised that the comforter may have had any value to the defense so as to require its preservation, and Luckett had failed to show bad faith on the part of law enforcement.
¶17 As to the newly discovered evidence and ineffective assistance claims, the circuit court accepted the State's contentions that Martin's opinions were merely new appreciations of old evidence, that trial counsel had thoroughly pursued potential avenues of defense prior to trial (including by having the bullet fragment removed from Luckett and tested), and that Luckett was not prejudiced by any shortcomings in the defense presentation because he failed to present any evidence in his postconviction motion that was based on more than speculation about what could have happened during the incident. Furthermore, because Martin could not opine that further testing of the bullet fragment taken from Luckett would do anything more than show a mere possibility that a second firearm had been used, the court denied Luckett's request for further discovery. Luckett now appeals.
DISCUSSION
¶18 On appeal, Luckett raises the same issues he raised in his postconviction motion. Namely, he argues: (1) he was denied due process because the bed comforter had potentially exculpatory value and law enforcement failed to preserve it as evidence; (2) the anticipated testimony of his criminologist constitutes newly discovered evidence; (3) his trial counsel was ineffective for not procuring the testimony of a firearms expert; and (4) he is entitled to postconviction discovery regarding additional testing of the bullet fragment that was removed from his body. For the reasons that follow, we reject all of these arguments. We therefore conclude the circuit court properly determined that the record conclusively showed Luckett was not entitled to relief.
I. Luckett was not denied due process by law enforcement's failure to preserve the bed comforter as evidence.
¶19 Wisconsin has a "well-settled and long standing body of law on the due process implications of evidence preservation and destruction." State v. Luedtke , 2015 WI 42, ¶41, 362 Wis. 2d 1, 863 N.W.2d 592. Police do not have an undifferentiated and absolute duty to retain and preserve all material that might be of conceivable significance in a particular prosecution. Id. , ¶44 (citing Arizona v. Youngblood , 488 U.S. 51, 58 (1988) ).
¶20 Rather, a defendant can show his or her due process rights were violated by demonstrating that the evidence law enforcement failed to preserve was "apparently exculpatory or that the State acted in bad faith by destroying evidence that was potentially exculpatory." Id. , ¶41. Evidence is potentially exculpatory when the best that can be said is that it might have had exculpatory value to the defense. See Illinois v. Fisher , 540 U.S. 544, 547 (2004). Bad faith requires the defendant to show that law enforcement officers were aware of the potentially exculpatory value or usefulness of the evidence they failed to preserve, and that the officers acted with "official animus or made a conscious effort to suppress exculpatory evidence." Luedtke , 362 Wis. 2d 1, ¶46 (citing State v. Greenwold , 189 Wis. 2d 59, 69, 525 N.W.2d 294 (Ct. App. 1994) ). Whether the State's conduct has violated a defendant's due process rights presents a question of law, which we review de novo. Id. , ¶37.
¶21 Here, Luckett appears to argue the police acted in bad faith by failing to preserve potentially exculpatory evidence. However, Luckett merely contends that the bed comforter "constituted exculpatory evidence and the police investigation was performed in bad faith by failing to search for and retain potential evidence of another gun." This summary analysis fails to explain why police should have viewed the bed comforter as "potentially exculpatory." Luckett emphasizes that police knew of Luckett's claim that he had acted in self-defense after he was shot at during the encounter. However, as the State points out, prior to trial there was no information suggesting that Peter had fired a gun at Luckett from underneath the bed comforter. Indeed, Luckett had told investigators that he "could see [Peter's] gun," that Peter "was sitting on the bed and had the gun pointed at [him] and just opened fire," and that he had "actually seen ... the fire from [Peter's] gun first as I was in the process of trying to get my firearm."
¶22 Luckett fails to respond to the State's assertion that law enforcement officers lacked information that would have led them to reasonably believe the bed comforter had potential exculpatory value, especially in light of his statements to the investigators. Instead, he faults Fitting's investigation for failing to explain how he was shot, essentially accusing police of ignoring his account or not taking his version of the crimes seriously. Regardless of Luckett's concerns that law enforcement dismissed his version of events, it is undisputed that the bed comforter he now complains about did not feature in his story until trial. See Greenwood , 189 Wis. 2d at 69 ("[U]nder Youngblood and the cases interpreting its standard, ... bad faith can only be shown if ... the officers were aware of the potentially exculpatory value or usefulness of the evidence they failed to preserve."). As a result, Luckett has failed to demonstrate that officers were aware the comforter had potential exculpatory value when they failed to collect or preserve it, much less that they acted with animus or made a conscious effort to suppress exculpatory evidence.
II. The anticipated testimony of Luckett's criminologist does not constitute newly discovered evidence.
¶23 A defendant seeking to set aside a judgment of conviction based on newly discovered evidence must show that the conviction resulted in a "manifest injustice." State v. Avery , 2013 WI 13, ¶25, 345 Wis. 2d 407, 826 N.W.2d 60. To make such a showing, the defendant must prove by clear and convincing evidence that: (1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative. Id. If the defendant makes such a showing, the circuit court must determine whether a reasonable probability exists that a new trial would produce a different result. Id. The decision to grant or deny a motion for a new trial based on newly discovered evidence is committed to the circuit court's discretion. Id. , ¶22.
¶24 Luckett asserts Martin's opinions constitute newly discovered evidence entitling him to a new trial. Although he identifies the four elements of newly discovered evidence, he fails to apply those elements to the evidence here. Instead, he summarily states that Martin's anticipated testimony "satisfies all four criteria." We agree with the State that, given Luckett's failure to develop a minimally cogent argument regarding how Martin's opinions satisfy the newly discovered evidence standard, Luckett's argument is insufficiently developed. See State v. Pettit , 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).[6]
¶25 In any event, Luckett's newly discovered evidence claim fails on its merits. Luckett appears to focus on several aspects of Martin's report, specifically his opinions that: (1) based on the manner in which the bed comforter's threading is depicted in a police photograph, a bullet appears to have exited the comforter from the bottom to the top; and (2) the bullet fragment removed from Luckett would contain traces of gilding material if it had been fired by the Glock and, if it was subjected to trace testing and found to contain "no evidence of gilding material, it is possible that it would have originated from a separate firearm."
¶26 As the State ably explains, Martin's opinions in these respects are not new evidence. Both the photographs of the bullet holes in the comforter and the bullet fragment recovered from Luckett existed and were known to Luckett before trial. In fact, Luckett's defense counsel expressly advised the circuit court at a pretrial hearing that he had performed a visual examination of the bullet fragment and was determining if further testing was warranted. When the evidence used by a postconviction expert to form the basis for his or opinion existed and was known to the defense prior to trial, the opinion is merely a new appreciation for evidence previously known but not used, and it does not constitute newly discovered evidence. State v. Fosnow , 2001 WI App 2, ¶¶9, 12, 16, 240 Wis. 2d 699, 624 N.W.2d 883.[7]
III. Luckett did not receive ineffective assistance of trial counsel.
¶27 A defendant claiming ineffective assistance of counsel must demonstrate both that his or her lawyer's representation was deficient and that he or she suffered prejudice as a result of that deficient performance. Strickland v. Washington , 466 U.S. 668, 687 (1984). An attorney performs deficiently when his or her conduct falls outside the wide range of professionally competent assistance. State v. Pico , 2018 WI 66, ¶19, 382 Wis. 2d 273, 914 N.W.2d 95. To establish prejudice, the defendant must show a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different. Id. , ¶20. If this court concludes that the defendant has not satisfied one prong of the test, we need not address the other. Strickland , 466 U.S. at 697.
¶28 An ineffective assistance of counsel claim presents a mixed question of fact and law. Pico , 382 Wis. 2d 273, ¶13. We will not overturn the circuit court's findings of fact, including the circumstances of the case and counsel's conduct and strategy, unless they are clearly erroneous. Id. However, we review de novo whether those facts demonstrate ineffective assistance of counsel. Id.
¶29 According to Luckett, his trial attorney performed deficiently by
failing to present evidence to the jury about the missing bed comforter and how gunshot residue on the bed comforter would show that [Peter] shot him first; failure to present expert testimony that the photographs of the bed comforter indicate that a bullet was fired from underneath the bed comforter; and, failure to have the bullet that was removed from Luckett submitted for a trace evidence examination to determine if the bullet fragment is inconsistent with the ammunition recovered from the scene by the police.
Luckett contends that as a result of these failures, "the jury heard no testimony about the how [sic] another gun may have been present[,] which would have corroborated Luckett's testimony that [Peter] shot him first."
¶30 As to counsel's failure to present evidence regarding the missing bed comforter and potential existence of gunshot residue, Luckett has failed to demonstrate prejudice resulting from any allegedly deficient performance. It is undisputed the bed comforter was not preserved in evidence and was unable to be examined for gunshot residue. As such, any additional testimony regarding the missing bed comforter would not have corroborated Luckett's testimony at trial. Moreover, Luckett never confronts the fact that, had he emphasized the fact that the comforter was not collected into evidence, Fitting likely would have testified consistent with his postconviction representations to the assistant district attorney that he had examined the bedding materials at the time and there were "no powder burns or anything resembling a burn, that would indicate that any of these items came into contact with a discharged firearm." Based on the existing record, any expert testimony that gunshot residue was present on the bed comforter would be speculative.
¶31 Luckett also faults trial counsel for his failure to present expert testimony consistent with Martin's conclusions that a photograph of the bed comforter indicated a bullet was fired from underneath the comforter. However, this conclusion was based entirely upon Martin's visual examination of the photograph, including the "amount of threads which appear to be showing the direction of the projectile as it passed through." Martin's report contains no basis upon which to conclude he has any special qualifications to opine upon photographic evidence involving firearm use. The photograph was presented to the jury, which was able to make its own assessments of the positioning of the threads given Luckett's testimony. We perceive no basis upon which to conclude Luckett's trial counsel was deficient for failing to present arguably lay testimony regarding the positioning of the comforter threads, nor do we perceive a reasonable likelihood of a different result if the jury had heard Martin's "expert" opinion.
¶32 Finally, the record conclusively shows that there is no merit to Luckett's assertion that his attorney was constitutionally ineffective for failing to have the bullet fragment removed from his body subjected to trace testing. Martin's report is highly ambiguous as to whether he could reach any opinion about a second weapon being used at the scene even if the bullet fragment was subjected to trace testing. Martin appears to state that a trace evidence test would reveal whether gilding material is present in the bullet fragment. The presence of such gilding material would only have enhanced the State's case, as it would be consistent with the bullet having been fired from Luckett's Glock. However, Martin then goes on to state that the absence of gilding material would show only that it was "possible" that the bullet originated from a "separate firearm."
¶33 Given the record here, it is inconceivable that Luckett could have suffered prejudice as a result of any alleged deficiency on the part of his trial attorney in not requesting trace evidence testing of the bullet fragment. Even if the trace evidence testing revealed the absence of gilding material, a mere possibility that the bullet was fired from a second gun is insufficient to undermine our confidence in the outcome of the trial. See State v. Starks , 2013 WI 69, ¶55, 349 Wis. 2d 274, 833 N.W.2d 146. Even a favorable result from the test, at least according to Martin, would do little to bolster Luckett's testimony regarding how the crimes occurred. There must be a "substantial, not just conceivable, likelihood of a different result," for purposes of analyzing prejudice. Id.
IV. Luckett is not entitled to postconviction discovery.
¶34 Luckett also challenges the denial of his motion for postconviction discovery. He maintains he is entitled to an order permitting him access to the trial evidence for examination and requiring the State to perform a trace evidence test on the bullet fragment recovered from his body.
¶35 A party seeking postconviction discovery must establish that the evidence sought to be gained is material. State v. O'Brien , 223 Wis. 2d 303, 320, 588 N.W.2d 8 (1999). Evidence is material, or consequential, only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. Id. at 320-21. Like the prejudice standard for ineffective assistance of counsel, the postconviction discovery test defines a "reasonable probability" as a probability sufficient to undermine our confidence in the outcome of the proceedings. Id. at 321. The mere possibility that an item of undisclosed information might have helped the defense does not establish materiality in the constitutional sense. Id. (citing United States v. Agurs , 427 U.S. 97, 109-110 (1976) ).
¶36 As previously explained, there is no evidence in the record that would permit this court to conclude that additional examination of the evidence, including trace evidence testing of the bullet fragment, would produce a reasonable probability of a different result in Luckett's case. Luckett's representations that further examination might yield additional information relevant to his case are merely speculative. Moreover, Martin's report concedes that if trace testing returned a favorable result for Luckett, at best it would show only that it was "possible" a second gun was used. The circuit court properly denied Luckett's motion for postconviction discovery.
By the Court. -Judgment and order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

Pursuant to the policy underlying Wis. Stat. Rule 809.86 (2017-18), this opinion will use pseudonyms to refer to the victims in this case. All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

Janice testified she was not sure whether Peter was striking Luckett with the same gun Luckett had used earlier, and Janice did not know whether Peter had his own gun. Janice did not know what had happened to Luckett's gun after the three had initially struggled for it, but she did not believe Luckett had the gun anymore during the hallway struggle.
Janice also testified she owned a silver .357 revolver with a brown handle. The casings from bullets fired from that gun would remain in the revolver cylinder and would not be ejected. However, Janice testified that she did not see anyone use the revolver on the night in question. Janice normally kept the revolver in her bedroom, but she had moved it to a spare room a few days before the shooting incident because she believed Luckett was "going for [her] gun" on a prior occasion when he was at her house.

Tasha's testimony was also consistent with the events Janice and Peter described. Tasha said that when Luckett initially entered the house, she saw him holding something that she believed was a gun but could not positively identify. Tasha testified she heard a total of three shots during the incident.

Although Luckett maintains that Martin is a firearms expert, his report does not include any indication of his credentials in this area, and Martin describes himself as a "criminologist."

Judge Jonathan D. Watts presided over the trial and entered the judgment of conviction. Judge T. Christopher Dee denied Luckett's postconviction motion.

Although Luckett provides a citation to State v. Edmunds , 2008 WI App 33, 308 Wis. 2d 374, 746 N.W.2d 590, that case is inapposite. The newly discovered evidence in that case was an expert opinion based on new medical knowledge of "shaken baby syndrome" that generated a "significant and legitimate debate in the medical community" in the years following the defendant's trial. Id. , ¶15. Contrary to what Luckett appears to be suggesting, Edmunds does not establish that any "new" expert opinions that postdate a defendant's trial constitute newly discovered evidence.

Luckett also mentions Martin's opinion that the underside of the bed comforter would have "considerable stippling and powder burns if a handgun had been fired through it at a close distance." However, as all parties readily acknowledge, the bed comforter was not preserved. Thus, Martin conceded he could make "no determination" regarding such matters.